```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                      CASE NO. 19-CR-60387-RKA

UNITED STATES OF AMERICA,
                                        Fort Lauderdale, Florida
              Plaintiff(s),
                                        December 18, 2019
     vs.

MOSTAFA HUSSAINI,

              Defendant(s).      Pages 1 - 19
------------------------------------------------------------

                             HEARING
             TRANSCRIBED FROM DIGITAL AUDIO RECORDING
             BEFORE THE HONORABLE JOHN J. O'SULLIVAN
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   BERTILA L. FERNANDEZ, ESQ.
                        UNITED STATES ATTORNEY'S OFFICE
                        99 NE 4th Street
                        Miami, FL 33132
                        (305) 961-9099
                        bertila.fernandez@usdoj.org


FOR THE DEFENDANT(S):   KATE TAYLOR, ESQ.
                        FEDERAL DEFENDER'S OFFICE
                        150 West Flagler Street
                        Miami, FL 33130
                        (305) 563-6900
                        kate_taylor@fd.org



TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com
```

```
 1   Thereupon,
 2   the following proceedings were held:
 3            THE DEPUTY CLERK:  United States v. Mostafa Hussaini.
 4            MS. FERNANDEZ:  Good morning, your Honor.  Bertila
 5   Fernandez on behalf of the United States.
 6            THE COURT:  Thanks.
 7            MS. TAYLOR:  Good morning, your Honor.  Kate Taylor,
 8   assistant Federal Defender, on behalf of Mr. Hussaini, who is
 9   present before the court.
10            THE COURT:  OK.  This matter is on for a detention
11   hearing.  Were you prepared to go forward?
12            MS. TAYLOR:  Your Honor, my client has been in medical
13   since his initial and so I haven't been able to visit him at
14   FDC.  My hope is that we could reset it for the afternoon which
15   would allow me to visit him in lockup and be prepared to go
16   forward with the hearing in the afternoon.
17            THE COURT:  Is that good with the government?
18            MS. FERNANDEZ:  That's fine with the government, your
19   Honor.
20            THE COURT:  OK.  So we'll reset it for 1:30.
21            MS. TAYLOR:  Thank you, Judge.
22            THE COURT:  All right.  Thank you.
23            Thank you, Mr. Hussaini.
24            (Recess)
25            THE COURT:  Have Mr. Mostafa Hussaini come to the
```

1 microphone, please.

2 MS. FERNANDEZ: Good afternoon, your Honor. Bertila
3 Fernandez on behalf of the United States.

4 THE COURT: Thanks.

5 MS. TAYLOR: Good afternoon, your Honor. Kate Taylor,
6 assistant Federal Defender, on behalf of Mr. Hussaini, who is
7 present before the court.

8 THE COURT: OK. Good. All right. Are we ready to go
9 forward with the detention hearing?

10 MS. FERNANDEZ: Yes, your Honor.

11 MS. TAYLOR: Yes, your Honor.

12 THE COURT: All right. The government can proceed by
13 proffer.

14 MS. FERNANDEZ: Thank you, and task force officer
15 Jason Phillips of the FBI is present for cross-examination.

16 THE COURT: Thanks.

17 MS. FERNANDEZ: This defendant was charged by
18 complaint on December 12, 2019 based on Section 875(c), and the
19 evidence is as follows:

20 On or about December 6, 2019, a Miami-Dade County
21 resident alerted the Miami-Dade County communications --

22 THE COURT: Let me just say I've read the complaint.

23 MS. FERNANDEZ: OK.

24 THE COURT: So you don't need to repeat everything in
25 the complaint.

```
 1                MS. FERNANDEZ:  OK.
 2                THE COURT:  We'll incorporate that into the hearing.
 3                MS. FERNANDEZ:  For purposes of understanding, I know
 4    the court likes efficiency.  I was going to then go over some
 5    of the statements in the videos.
 6                THE COURT:  Yes, but you can do them in summary
 7    fashion --
 8                MS. FERNANDEZ:  OK.
 9                THE COURT:  -- instead of reading from the complaint.
10                MS. FERNANDEZ:  No problem.
11                So law enforcement was alerted based off this tip, and
12    during the investigation they discovered a YouTube account that
13    is owned by the defendant and they became aware of 12 videos of
14    concern that were published to the account, and a review of the
15    video led to the discovery of threatening communications,
16    specifically about African-Americans, Christians, other
17    religious members, and American people.
18                On December 8th, in specific, the defendant published
19    a video on YouTube that was taken at a Broward County public
20    park titled Soldier Burns, Fantasizing to Burn Enemy.  In that
21    video he stated, next to an open flame which he created by
22    pouring accelerant, that he wishes to burn black people.
23                He continues in the commentary or About section to
24    make racial slurs and derogatory comments, and he states that
25    he's a very serious warrior and that he is the type of warrior
```

1  that kings fear the most -- if not kings, chiefs of police and
2  defense ministers fear the most -- and that he kills proudly,
3  and anyone you bring to the battle will be killed all the way
4  to your Jesus, whose story is famous.  I kill, I burn, and I am
5  ambitious for more kills.  I am a king killer.
6        He also goes on to say that he is a racist and only a
7  few of his own race is plenty to live on, and people who are
8  stupid to in-tract with him if you disrupt me that he will burn
9  them when the war begins.
10       Then on November 24th in the video titled, My Shit in
11  a Christmas Hat -- excuse the foul language -- the defendant is
12  seen holding --
13       THE COURT:  In a what?
14       MS. FERNANDEZ:  My Shit in a Christmas Hat.  That is
15  not in the complaint.  That was a recent video that was
16  discovered from November 24th.
17       He shows a pocketknife mid-video and states:  Last
18  thing I see is this knife.  This knife is a nice knife.  Only
19  has some things in it.  Takes out the eyes of peoples.  Make
20  sure don't fight me.  You'll lose.  It will -- you'll lose.
21  You'll lose.  You'll get it.  I'll be done with you.  And he
22  continues in that about and information section to write:  I am
23  extremely racist.  I give the highest respect to my own self
24  followed to my very lookalike racist associates who must be
25  warriors to maintain, sustain and regulate this racist-proud

1  lifestyle into the future.  It is better not to fight than to
2  fight, but I and my associates don't have any solution but to
3  fight the non-members into war and kill them.  If you are a
4  non-member, I will kill you.  I want you to know this.  And if
5  you think you can do anything about it, my contact information
6  is on my profile.
7       I'm embarrassed to keep challenging you to mortal
8  combat, and nobody can accept my challenge.  So if not, then
9  like all magots on my shit that is the food you get, that's how
10 you get the food you serve to you.  Eat my shit, you religious
11 magots, until I take your eyes out and fill your eye sockets
12 with shit.  This shit is in the religious hat has some magots,
13 drown in it.  And he continues on from there.
14       Along with these videos he also has videos where he
15 burned a live parakeet that he named Jesus while discussing how
16 he wanted to burn Christians and African-Americans and
17 Americans, again, while making other additional threats.
18       THE COURT:  OK.  And why do you think he should be
19 detained?
20       MS. FERNANDEZ:  Your Honor, we believe that he is a
21 risk of flight and a danger to the community.  We agree with
22 the recommendation of Pretrial Services, who would be
23 supervising the defendant, that no condition or combination of
24 conditions will assure the defendant's appearance at court and
25 the safety of the community.

1          This defendant was previously convicted and sentenced
2    to two years and nine months in Arizona for aggravated assault.
3    He was released in 2008.  Additionally, based on --
4          THE COURT:  2008?
5          MS. FERNANDEZ:  I mean in 2018.  I'm sorry.
6          Based on the commentary on the YouTube, he's not only
7    making verbal threats but he's using overt actions in these
8    videos.  We see him burning a live parakeet.  We see him car
9    shopping in one of them at a Mitsubishi dealership, and that
10   video is titled, Mitsubishi, My Weapon of Choice, where he
11   states in a comment:  Like a warrior, be ready to kill.  The
12   car to run over the enemy head and break it, smash it on the
13   ground like an egg.
14         Additionally, in a December 7th video, like I said
15   before -- I'm sorry, November 24th video -- we see him holding
16   that pocketknife and threatening to gouge out the eyes of
17   Christians.  Not to mention that he created an open flame while
18   discussing he wanted to wear blacks.  And recently also it's
19   come to our attention there is a video in Hard Rock Casino in
20   Broward County where he talks about not wanting to allow blacks
21   in his casino if he had one and that he likes to treat people
22   in the casino like dogs, which is concerning because he did
23   burn a live animal in a video, and also made a statement to the
24   law enforcement that arrested him while being transported that
25   if released he would continue to make videos of himself burning

1  and killing animals.

2  Additionally, in that casino video he states he has a
3  concealed permit and that he has a weapon on him, and although
4  he hadn't used it that day, he urged people to come to the
5  casino carrying a gun wearing a long coat and putting the gun
6  in the mouths of the men and women who were there.

7  Additionally, he is a flight risk because he is
8  homeless.  He's unemployed.  He is living out of a Kia van that
9  is registered to him.  He did state to Pretrial Services that
10 he could be released to his parents, but he told law
11 enforcement that he did not want his parents contacted nor his
12 siblings.  So we're not persuaded that he would actually go to
13 live with his parents in New Jersey.

14 He also has a history of not complying with bond
15 recommendations.  As recently as October 13th, he was arrested
16 in Georgia, posted bond, and is now in violation of the bond
17 because he needed court permission to leave Glynn County.

18 THE COURT:  OK.  What do you say, Ms. Taylor?

19 MS. TAYLOR:  Your Honor, I would have a few questions
20 for the task force officer.

21 THE COURT:  All right.  Have the agent or officer come
22 up.

23  JASON PHILLIPS,
24     called as a witness,
25     having been duly sworn, testified as follows:

1       THE DEPUTY CLERK: Please be seated. State and spell
2  your name for the record.
3       THE WITNESS: Jason Phillips. J-A-S-O-N,
4  P-H-I-L-L-I-P-S.
5       THE COURT: Tell us who you're employed with.
6       THE WITNESS: I'm employed by the FBI, Joint Terrorism
7  Task Force.
8       THE COURT: So are you also a police officer?
9       THE WITNESS: I am a special agent with the Department
10 of Defense.
11      THE COURT: All right. Go ahead.
12 CROSS-EXAMINATION
13 BY MS. TAYLOR:
14 Q. Agent, were you present for the government's proffer?
15 A. I was.
16 Q. And do you agree with it?
17 A. I do.
18 Q. Any corrections or additions you need to make?
19 A. No.
20 Q. OK. So you would adopt it as your own direct testimony?
21 A. Yes.
22 Q. OK. Now, very briefly, I want to understand your role in
23 this investigation.
24      Have you personally reviewed the videos that were
25 referenced?

1  A.  I have.

2  Q.  All of them?

3  A.  Yes.

4  Q.  And were you present for my client's arrest?

5  A.  I was not.

6  Q.  Were you present for his interview after?

7  A.  I was not.

8  Q.  OK.  Are you familiar, have you spoken with officers about
9  the arrest and the statement after?

10 A.  Yes.

11 Q.  OK.  So I can ask you questions about that.  OK.

12      So just starting with the arrest, was Mr. Hussaini
13 taken into custody without incident?

14 A.  Yes.

15 Q.  He did not attempt to flee?

16 A.  No.

17 Q.  He did not fight back or resist arrest?

18 A.  No.

19 Q.  OK.  And afterwards he was interviewed?

20 A.  Yes.

21 Q.  And he gave a statement?

22 A.  He did.

23 Q.  In that statement was he advised of his Miranda rights?

24 A.  I would have to talk to the agent.

25 Q.  OK.  And do you know if that interview was recorded, either

```
1    audio or video?
2    A.   Both.
3    Q.   OK.  And so he was compliant, to your knowledge, during the
4    arrest and during the statement?
5    A.   Yes.
6    Q.   OK.
7              MS. TAYLOR:  Those are all my questions.
8              THE COURT:  OK.  Anything further for this agent?
9              MS. FERNANDEZ:  No, your Honor.
10             THE COURT:  All right.  Thank you, Agent.  You can
11   step down.
12             (Witness excused)
13             THE COURT:  Ms. Taylor, do you have any argument or
14   evidence?
15             MS. TAYLOR:  Argument, your Honor.
16             THE COURT:  OK.
17             MS. TAYLOR:  We appreciate that the videos are
18   disturbing, but there is no evidence of any actual physical
19   harm to any person or that Mr. Hussaini attempted to harm any
20   person.  So our position --
21             THE COURT:  I notice you're saying person, not any
22   thing.
23             MS. TAYLOR:  That's right, your Honor.
24             THE COURT:  Because there is a parakeet that was
25   injured, correct?
```

```
 1              MS. TAYLOR:  That's my understanding of the allegation
 2    at this point.
 3              I also would submit that this is not a detainable
 4    offense under the danger section of the Bail Reform Act.  It
 5    doesn't qualify under (f)(1) which sets forth the type of
 6    offenses that can be detainable, and I don't believe he would
 7    qualify under (f)(2)(B) of the Bail Reform Act, which the
 8    government --
 9              THE COURT:  Hold on.  Let me take a look.
10              MS. TAYLOR:  Yes, your Honor.
11              THE COURT:  Is this a -- let me ask the government.
12    What are you proceeding on as far as danger to the community?
13    I thought it was a crime of violence, but -- so direct me to
14    the ones that you think it doesn't come under.
15              MS. FERNANDEZ:  Your Honor, the Eleventh Circuit has
16    held that we can proceed on danger not just on the offenses
17    that are enumerated in the statute.
18              The other issue is he is discussing inciting violence
19    through others, and there is case law.  Just to the point she
20    made about whether or not it is a subjective intent or
21    objective intent, first, these are true facts.  There is an
22    objective requirement that a reasonable person would feel
23    threatened.  And based off the tip from Miami-Dade, the
24    Miami-Dade --
25              THE COURT:  Well, I didn't hear that argument.
```

```
1           MS. FERNANDEZ:  She discussed how -- never mind.
2           THE COURT:  I'm sorry.  Tell me why you think it
3  doesn't come under the Bail Relief Act, 3142.  Bail Reform Act.
4           MS. TAYLOR:  Your Honor, it is our position that in
5  order for the government to proceed under danger it needs to be
6  a crime of violence -- well, looking at Section (f) -- 135 --
7  let me make sure I have this right.
8           THE COURT:  3142, right?
9           MS. TAYLOR:  3142(f)(1) delineates the types of
10 offenses and the requirements for the government to proceed
11 under danger under that section.  I don't believe it qualifies.
12          THE COURT:  It says --
13          MS. TAYLOR:  Crime of violence where the maximum term
14 of imprisonment is ten years or more.
15          My understanding is the way the government has charged
16 this it is a statutory maximum of five years, and I don't
17 believe it qualifies under any of the other subsections.
18          THE COURT:  OK.
19          MS. TAYLOR:  Under, lower down in that, 2(e) is the
20 other reference to a type of danger, and I don't believe the
21 government has --
22          THE COURT:  I'm sorry.  I don't see a 2(b).
23          MS. TAYLOR:  I'm sorry, your Honor.  (f)(2)(B).
24          THE COURT:  Let me see.  2(b), a serious risk that
25 such person will obstruct or attempt to obstruct justice.  Is
```

1    that what you are talking about?
2            MS. TAYLOR: Correct. I don't believe that there is
3    any evidence that would substantiate detention under that.
4            THE COURT: OK.
5            MS. TAYLOR: In which case we're essentially left with
6    serious risk of flight.
7            THE COURT: Yes.
8            MS. TAYLOR: And I don't believe that there are no
9    conditions that your Honor could set to deal with that.
10           So we would propose as a combination of conditions,
11   given Mr. Hussaini's unstable living situation down here in
12   Miami, he's willing to go into a halfway house, he's willing to
13   have a GPS or electronic monitoring, and I think that would
14   provide the court reasonable assurances that he would appear in
15   the future and that that would -- since the Bail Reform Act
16   instructs the court to try to find the least restrictive
17   conditions and favors release, that would be sufficient to
18   address any concerns that the court would have in this case.
19           He does not have any money so we are asking for a
20   personal surety bond. He's also willing to undergo mental
21   health evaluation and treatment if that is appropriate, and
22   certainly any travel documents and all of the other standard
23   conditions he's willing to comply with.
24           So he would not be able to leave the jurisdiction. He
25   is willing to not go near any airports or other transportation

```
 1   establishments.  And being in a halfway house, there are
 2   additional restrictions on his liberty so that he would not be
 3   free to leave on a whim.
 4           So I think that all of those conditions combined can
 5   reasonably assure the court he will appear in the future.
 6           THE COURT:  OK.  What does the government say about
 7   the applicability of a crime of violence in 3142?
 8           MS. FERNANDEZ:  Your Honor, if you look at (f)(1)(A).
 9           THE COURT:  Yes.
10           MS. FERNANDEZ:  It says it involves a crime of
11   violence.  We believe that the ten-year imprisonment maximum
12   does not modify the fact that this threat is a threat of making
13   violence.  We think it is a crime of violence.
14           Additionally, as for risk of flight --
15           THE COURT:  So you're saying for which a maximum term
16   of prison of ten years or more does not modify the crime of
17   violence --
18           MS. FERNANDEZ:  Correct.
19           THE COURT:  -- it only modifies the offenses listed in
20   Section 2332(g)(5)(B).
21           MS. FERNANDEZ:  Yes.  Based off the comma.
22           Additionally, I can appreciate the defense's
23   statements regarding halfway house and monitoring, but he has
24   no ties to the Southern District of Florida.  We already know
25   as recently as October 13th when he posted bond in Georgia,
```

1    it's already been violated because he came down here and he was
2    not to leave that county without permission of the court.  So
3    we know he has a history now of bond violations, plus he has a
4    criminal history where he's committed aggravated assault.
5            So we don't know that it will actually keep him here.
6    And he did not want his parents contacted.  So we can't be sure
7    that he will actually go to New Jersey and live with his
8    parents.  I know if, that would be another suitable place that
9    the court would agree to send him.
10           MS. TAYLOR:  Your Honor, if I may just briefly
11   respond.  To the extent that the government is proceeding on
12   danger and your Honor does entertain that, I would just want to
13   reiterate that there is no evidence of any actual harm to any
14   person, any attempt to harm any person.  And so while we
15   certainly appreciate that the allegations and the videos sound
16   very disturbing, it is not a case where he has attempted or
17   successfully injured a human being.  So I think that that sets
18   it apart from other cases that your Honor may consider
19   detention under danger.
20           We're not suggesting that he go back to New Jersey at
21   this point.  That is why we proposed the halfway house.  I
22   think that would address the risk of flight concerns.  And to
23   the extent that your Honor would want additional conditions on
24   top of the halfway house, he is willing to have a GPS ankle
25   monitor attached on top of that.

```
 1            THE COURT:  What about the government's argument that
 2   if you read the statutory construction of 3142(f)(1)(A) it says
 3   a crime of violence, a violation of Section 1591, or an offense
 4   listed in 2332 for which a maximum term of ten years or more is
 5   prescribed?
 6            MS. TAYLOR:  Your Honor, I would maintain that it is
 7   the way we presented it, but I do not have additional authority
 8   to present to the court.
 9            THE COURT:  OK.  I find the weight of the evidence
10   against the defendant is substantial.  He is seen on videos
11   talking about committing violence against black people, against
12   Spanish people, against some white people, and also against
13   animals, where he actually set a parakeet on fire and indicated
14   the name of the parakeet was Jesus.  Also -- not described in
15   the complaint but described by counsel -- he talked about using
16   a knife and taking people's eyes out.  So I find there is
17   substantial evidence in that there's his image on these videos
18   where he's making these threats.
19            I find by a preponderance of the evidence that no
20   condition or combination of conditions will reasonably assure
21   the appearance of the defendant as required at future
22   proceedings.  The reason I find that is because defendant has
23   no address here.  He's living in a van.  His only address or
24   his own relatives reside in New Jersey, and he's indicated he
25   doesn't want his mother or his father contacted.
```

```
 1              In addition, his suggestion is that he be put into a
 2   halfway house.  I find that putting him in a halfway house
 3   would not ensure that he appear here in court as required, and
 4   the reason for that is -- well, two reasons I wouldn't want to
 5   put him in a halfway house.  One is that he is dangerous.
 6   Regardless of whether or not he can be held as a danger, I
 7   think it would be dangerous to put him in a halfway house where
 8   he would be a danger to others who were residing there due to
 9   his threats, most likely especially in Miami.  I think he
10   pointed out in one of his videos that in Miami there are no
11   white people, there are just black and Hispanic people or
12   something to that effect.  So I suspect that there would be
13   people there who he's indicated he doesn't like, which could
14   result in violence to them.
15              In addition, the defendant was recently released on
16   bond out of Glynn County, Georgia, on October 13, 2019, where
17   he had a condition of bond to receive permission prior to
18   leaving that county, and he was found here recently, within
19   approximately two months of that arrest, here in the South
20   Florida area.  So I find he is not likely to obey any
21   conditions of bond that I set.
22              I also find by clear and convincing evidence that no
23   condition or combination of conditions will reasonably assure
24   the safety of the community.
25              I agree with the government's reading of 314 -- I lost
```

```
 1  it now.  Is it 3142?
 2          MS. FERNANDEZ:  (1)(A).
 3          THE COURT:  3142(f)(1)(A), which states that a person
 4  can be held as a danger to the community if the case involves a
 5  crime of violence.
 6          I find that this crime is a crime of violence as it's
 7  described in the complaint in that he's threatened to kill
 8  people, kill animals, and burn and knife people.
 9          I find by clear and convincing evidence that there's
10  no conditions that would reasonably assure the safety of the
11  community and due to the seriousness of the threats and the
12  fact that he actually set a parakeet on fire indicates that he
13  does not have a high regard for life.
14          So for all those reasons I order that he be detained
15  pending trial in this matter.
16          All right.  Anything else for Mr. Hussaini?
17          MS. TAYLOR:  No, your Honor.
18          MS. FERNANDEZ:  No, your Honor.
19          THE COURT:  So arraignment is set for December 26th at
20  10:00.
21          MS. TAYLOR:  Thank you.
22          THE COURT:  OK.  Thanks, Ms. Taylor.
23          Thank you, Mr. Hussaini.
24          (Adjourned)
25
```

C E R T I F I C A T E

    I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

January 27, 2020        s/ Joanne Mancari
                            Joanne Mancari, RPR, CRR, CSR
                            Court Reporter
                            jemancari@gmail.com