## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-60387-CR-ALTMAN

**UNITED STATES OF AMERICA**,

     *Plaintiff*,

*v.*

**MOSTAFA HUSSAINI**,

     *Defendant.*

_____/

### ORDER

Mostafa Hussaini posted two videos on YouTube: in the first, he threatened to kill Christians by stabbing out their eyes with a knife; in the second, he promised to murder Black people by burning their bodies in a fire. After a concerned citizen brought the videos to law enforcement's attention, a grand jury in our District indicted Hussaini on two counts of violating 18 U.S.C. § 875(c), which prohibits the transmission, in interstate or foreign commerce, of "any communication containing . . . any threat to injure the person of another." Indictment [ECF No. 7].

Hussaini now moves (for a second time) to dismiss that Indictment. *See* Refiled Motion to Dismiss Indictment (the "Motion") [ECF No. 77].[1] In his Motion, Hussaini submits that the "statements contained in the videos posted on YouTube, as charged in the indictment, do not violate § 875(c), constitute pure speech protected by the First Amendment, and do not fall within any of the categories of unprotected speech[.]" *Id.* at 2–3 (cleaned up). "Therefore," he says, "the prosecution of Mr. Hussaini based on those statements violates the First Amendment and as a result, the indictment

---

[1] The Motion is fully briefed and ripe for adjudication. *See* Government's Response in Opposition to Defendant's Motion to Dismiss Indictment ("Response") [ECF No. 79]; Refiled Reply in Support of Motion to Dismiss Indictment ("Reply") [ECF No. 81].

must be dismissed." *Id.* at 3. We disagree and now **DENY** the Motion.

BACKGROUND

On December 12, 2019, the Government charged Hussaini by criminal complaint. *See* Complaint [ECF No. 1]. The "facts necessary to establish probable cause to arrest Hussaini for violating § 875(c)" were set out in the affidavit of FBI Task Force Officer Monie J. Phillips, which was attached to the Complaint. Affidavit [ECF No. 1 at 3–11] (cleaned up). The Affidavit described, in some detail: (1) what Hussaini said and did in the four videos he posted online; (2) what Hussaini wrote about those four videos; and (3) how the FBI learned about the videos. *See id.* ¶¶ 4–11.

The Indictment, by contrast, is bare-bones and basically tracks the language of § 875(c) in charging Hussaini for two of the videos he posted. *See generally* Indictment. So, for instance, in Count I, the Indictment charges that, on November 24, 2019, Hussaini:

> did knowingly and intentionally transmit in interstate commerce from Florida, to a computer through the internet, an electronic communication, with the purpose of issuing a threat and with the knowledge that the communication would be viewed as a threat, in that he stated on YouTube that he hates Christians and religious people and that he was going to remove their eyes with a knife, in violation of Title 18, United States Code, Section 875(c).

*Id.* at 1. And, in Count II, the Indictment alleges that, on December 8, 2019, Hussaini:

> did knowingly and intentionally transmit in interstate commerce from Florida, to a computer through the internet, an electronic communication, with the purpose of issuing a threat and with the knowledge that the communication would be viewed as a threat, in that he stated on YouTube that he wanted to burn and kill all 'black' and other certain people, in violation of Title 18, United States Code, Section 875(c).

*Id.* at 1–2. Unlike the Complaint, then, the Indictment doesn't purport to quote from the videos, doesn't tell us how many videos there are, and doesn't describe the context in which the videos were made or published.

In his Motion, however, Hussaini quotes extensively from the videos. *See* Motion at 3–4 (including "[a] review of the videos *upon which the indictment rests*" (emphasis added)). In doing so, *he* tells us that the video described in Count I of the Indictment (1) is titled "Shit in a Christian Hat," (2)

2

shows "what appears to be excrement in a Santa Claus Hat," and (3) features Hussaini saying the following: "If you are Christian, I'll scoop out your eyes with a knife [or] with an ice cream scoop. If you are religious, don't fight me, I'll catch you, I'll kill you. I will shit in the eyes of religious people. This could happen to anyone. Make sure there is no government if you're religious." *Id.* at 2.

Hussaini proceeds to tell us that the second video (the subject of Count II)—titled "Soldier Burns, Fantasizing to Burn Enemy Population"—shows him standing in a public park, lighting a fire in a barbecue grill by pouring gasoline into it, and declaring: "Imagine burning a black person, because I don't like blacks. I, I cannot even name any blacks. I don't know any blacks. . . . This gasoline imagine burning some black soldiers they are going to look very black. I can burn thousands millions of them." *Id.* at 3–4.

 Having described the videos, Hussaini then "moves to dismiss the indictment on the grounds that the charged statements do not establish a violation of 18 U.S.C. § 875(c) and, if criminalized, would violate the First Amendment of the U.S. Constitution." *Id.* at 4; *see also id.* at 5 ("Because the facts alleged here, even if accepted as true, do not satisfy [the true threats] definition, the indictment must be dismissed."). And, Hussaini adds, his statements weren't "true threats"—and thus are protected by the First Amendment to the U.S. Constitution—because they weren't directed at a sufficiently particularized individual or group. *See id.* at 6–9.

In its Response, the Government takes the bait—at least in part: it tells us things about the videos that appear nowhere in the Indictment, *see* Response at 1–2, and it tries to show that Hussaini's statements *were* true threats, *see id.* at 7–12. To be fair, though, the Government *does* manage to contend that "the Defendant's motion is not cognizable as a motion to dismiss, because the issues presented are properly decided by a Rule 29 motion, or submitted to the jury, not a motion to dismiss[.]" *Id.* at 1; *see also id.* at 3–7 (arguing that the "Defendant's claims are not cognizable as a motion to dismiss").

THE LAW

## I.      Standard of Review

In adjudicating a criminal defendant's motion to dismiss an indictment, we confine our review

to the four corners of the indictment itself. *See United States v. Critzer*, 951 F.2d 306, 306–07 (11th Cir.

1992) ("The sufficiency of an indictment is determined from its face."); *United States v. Sharpe*, 438 F.3d

1257, 1263 (11th Cir. 2006) ("In ruling on a motion to dismiss for failure to state an offense, a district

court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge

the crimes."). The Eleventh Circuit thus prohibits district courts from "piercing the pleadings" to

resolve the merits of a criminal case because dismissal is appropriate only "where there is an infirmity

of law in the prosecution"; dismissal cannot be premised on "a determination of facts that should

have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987) (cleaned

up).

An indictment, moreover, needn't be elaborate, detailed, or complex. A "plain, concise, and

definite written statement of the essential facts constituting the offense charged" is all the Federal

Rules require. FED. R. CRIM. P. 7(c)(1). And an indictment comports with the Sixth Amendment so

long as it apprises the defendant of the charged conduct and allows him to avoid falling twice into

jeopardy. *See Russell v. United States*, 369 U.S. 749, 763–64 (1962) (explaining that the "protections

which an indictment is intended to guarantee" include: (1) "whether the indictment contains the

elements of the offense intended to be charged and sufficiently apprises the defendant of what he

must be prepared to meet"; and (2) "in case any other proceedings are taken against him for a similar

offense, whether the record shows with accuracy to what extent he may plead a former acquittal or

conviction"); *see also United States v. Bobo*, 344 F.2d 1076, 1083 (11th Cir. 2003) ("For an indictment to

be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise

the defendant of what he must be prepared to meet." (cleaned up)); *United States v. Yonn*, 702 F.2d

4

1341, 1348 (11th Cir. 1983) ("To pass constitutional muster, an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecutions for the same offense."). An indictment satisfies these constitutional requirements by "tracking the wording of the statute, as long as the language sets forth the essential elements of the crime." *Id.* (cleaned up).

## II.      18 U.S.C. § 875(c): the elements

The threats statute, 18 U.S.C. § 875(c), provides: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another shall be fined under this title or imprisoned not more than five years, or both." A few years ago, the Supreme Court read this statute as "requir[ing] proof that a communication was transmitted and that it contained a threat." *Elonis v. United States*, 575 U.S. 723, 737 (2015) (cleaned up). But the Court also read into the statute a *mens rea* requirement, reasoning that, because "the crucial element separating legal innocence from wrongful conduct is the threatening nature of the communication," the government must prove that the defendant "transmitted a communication *for the purpose of issuing a threat*, or *with knowledge that the communication will be viewed as a threat*." *Id.* at 737–40 (emphasis added).

As our Circuit's Pattern Jury Instructions make clear, then, a jury can find a defendant guilty of violating § 875(c) only if the government proves the following two elements beyond a reasonable doubt: "(1) the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another; and (2) the Defendant sent the message with the intent to communicate a true threat or with knowledge that it would be viewed as a true threat." Pattern Crim. Jury Instr. 11th Cir. OI O30.3 (2020) ("This instruction is based on *Elonis v. United States*[.]"). The Instructions define a "true threat" as "a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would place a reasonable person in fear of being

injured." *Id.* (cleaned up).

### III.    True Threats and the First Amendment

The First Amendment famously provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. amend I. Although the Supreme Court hasn't always agreed with Justice Black's view that "'make no law' means make no law," *see Mishkin v. State of N.Y.*, 383 U.S. 502, 517–18 (1966),[2] only a few "well-defined and narrow limited classes of speech" are subject to governmental restriction, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). "True threats" are one such class.

The doctrine made its first appearance in *Watts v. United States*, 394 U.S. 705 (1969). Speaking at a political rally in Washington, D.C., Robert Watts—a black man—told the crowd that he'd been drafted to serve in Vietnam and added that, "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers." *Id.* Based on these two lines, Watts was arrested and charged with violating 18 U.S.C. § 871(a), which makes it a crime to "threat[en] to take the life of or to inflict bodily harm upon the President of the United States." *Id.* at 706 (cleaned up). After the government rested its case at trial, Watts's lawyer moved under Rule 29 for a judgment of acquittal. *Id.* at 706–07. In Watts's view, no jury could find that he "made a threat against the life of the President" because his statement was "a kind of very crude offensive method of stating a political opposition to the President." *Id.* The district court denied the motion, the jury returned a verdict of guilty, and the D.C. Circuit affirmed. *Id.* at 706.

The Supreme Court reversed. "Certainly," it explained, "the statute under which petitioner was convicted is constitutional on its face . . . . Nevertheless, a statute such as this one, which makes

---

[2] *See also* Black, *The Bill of Rights*, 35 N.Y.U. L. REV. 865, 880 (1960) ("Nothing I have read in the Congressional debates on the Bill of Rights indicates that there was any belief that the First Amendment contained any qualifications.").

criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Id.* at 707. In explaining how lower courts should draw this distinction, the Court started by pointing out that Watts had made the comment at a political rally, that the comment was an obvious objection to the draft, and that many audience members had laughed when they heard it. *Id.* Viewing Watts's "political hyperbole" in this context—*i.e.*, the political nature of the rally, the discussion of the ongoing war in Vietnam, and "the expressly conditional nature of the statement and the reaction of the listeners"—the Court concluded that the statement was *not* a "true threat." *Id.* at 708.

The Court returned to the "true threats" doctrine in *Virginia v. Black*, 538 U.S. 343 (2003), where it explained that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 349 (citing *Watts*, 394 U.S. at 708). In *Black*, the Supreme Court considered a state law that made it "unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place." *Id.* at 348 (quoting VA. CODE ANN. § 18.2–423 (1996)). The prosecution didn't violate the First Amendment, the Court held, because the burning cross constituted a "true threat." *See id.* at 360–63 (explaining that the Virginia statute "does not run afoul of the First Amendment insofar as it bans cross burning with intent to intimidate" because cross burning is "a particularly virulent form of intimidation" and constitutes a "true threat" (cleaned up)). The Court (notably) reached this conclusion despite the fact that, in at least one instance, the cross was burned *with the consent of the property owner*—which, of course, means that the message the burning cross conveyed was directed at anyone who happened to drive by that field. *See id.* at 348 (noting that the cross was burned with the property owner's consent in "an open field" by a highway). The Court also rejected the defendant's view that, to be convicted of making a "true threat," a defendant must

have actually intended to carry out that threat:

> The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Id.* at 360.

The Ninth Circuit has interpreted this aspect of *Black* as establishing a subjective test that applies—as a constitutional baseline—to the analysis of *all* threat statues, including § 875(c). *See, e.g.,* *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011) ("Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech. The difference is that with respect to some threat statutes, we require that the purported threat meet an objective standard *in addition*, and for some we do not."). The Third Circuit, by contrast, has said that "the definition of the word 'threat' and the definition of the phrase 'true threat' are not co-extensive." *United States v. Stock*, 728 F.3d 287, 294 (3d Cir. 2013). "To be sure," that court has explained, "*Watts* taught us to interpret threat statutes in light of the First Amendment. But by distinguishing a 'true threat' from a 'threat' that would otherwise fall within the scope of a statute were it not protected by the First Amendment, *Watts* shows that 'true threats' are a specific subset of 'threats.'" *Id.* In other words, "the plain meaning of a 'threat' under § 875(c) is distinct from the constitutional meaning of a 'true threat' under the First Amendment." *Id.*

In any event, most courts agree that, "in the usual case, whether a communication constitutes a threat or a true threat is a matter to be decided by the trier of fact." *Id.* at 298 (cleaned up) (citing *United States v. Kosma*, 951 F.2d 549, 555 (3d Cir. 1991); *United States v. White*, 670 F.3d 498, 512 (4th Cir. 2012); *United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008); *United States v. Floyd*, 458 F.3d 844, 848–49 (8th Cir. 2006); *United States v. Viefhaus*, 168 F.3d 392, 397 (10th Cir. 1999); *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994)). And that's because, in deciding whether a statement constitutes

a "true threat," we must look closely *both* at the speech's content *and* at its context. *See United States v. Alaboud*, 347 F.3d 1293, 1297 (11th Cir. 2003) (explaining that "[t]he fact-finder must look at the context in which the communication was made to determine if the communication would cause a reasonable person to construe it as a serious intention to inflict bodily harm" and examining *contextual* clues, like the defendant's tone of voice and his graphic promises of violence), *overruled on other grounds by Elonis*, 575 U.S. at 726. Given this standard, courts dismiss indictments under the First Amendment *before* trial only in the clearest of cases—typically, where no factfinder could conclude that the statement constitutes a true threat of *future* harm. *See, e.g.*, *United States v. Landham*, 251 F.3d 1072, 1082 (6th Cir. 2001) (district court erred in refusing to dismiss an indictment under § 875(c) where it was "self evident" that the communications "refer[red] to past conduct, not present or future conduct"). So far as we're aware, in fact, only one federal judge has *ever* dismissed an indictment before trial on the argument Hussaini advances here—that, while the charged statements are disturbing and plainly threatening, they do not constitute "true threats" because their target audience was too inchoate and undefined. *See United States v. Baker*, 890 F. Supp. 1375 (E.D. Mich. 1995). And, to his credit, Hussaini never suggests that there are others. *See* Motion at 5 (relying only on *Baker*).

## ANALYSIS

We deny the Motion in three steps: *first*, by constraining our review to the four corners of the Indictment; *second*, by concluding that the Indictment satisfies the strictures of Rule 7; and *third*, by explaining why *context*, in a case like ours, is everything—by outlining, in other words, how a reasonable jury *could* find that Hussaini engaged in the kinds of true threats the First Amendment doesn't protect.

### I.    The four corners of the Indictment

We begin by declining Hussaini's invitation to review, at this preliminary stage of the case, the "statements in the videos posted on YouTube." Motion at 2–3. Since those statements—and the videos in which they appear—lie beyond the four corners of the Indictment, we may not consider

them yet. *See Critzer*, 951 F.2d at 307–08; *see also United States v. Salman*, 378 F.3d 1266, 1267–69 (11th Cir. 2004).

In *Critzer*, the defendant moved to dismiss the indictment, which charged him with bank fraud. *See* 951 F.2d at 307. The government opposed the motion—first by "asserting that the court was not to look beyond the face of the indictment in determining its sufficiency" and then by "gratuitously listing the facts that it expected to prove at trial and explaining how those facts constituted the offenses charged." *Id.* After considering the additional facts the government proffered, the district court found that the defendant hadn't violated the bank-fraud statute and dismissed the indictment. *See id.* The Eleventh Circuit reversed. In doing so, it made clear that "[t]here is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. Moreover, this court is constitutionally barred from ruling on a hypothetical question. The sufficiency of an indictment is determined from its face. The indictment is sufficient if it charges the language in the statute." *Id.* at 307–08.

The indictment in *Salman* charged the defendant—who had entered the United States on a student visa—with possessing a firearm while "illegally or unlawfully in the United States." 378 F.3d at 1267. Contending "that he was not illegally or unlawfully in the United States, as a matter of law, at the time of his arrest," the defendant moved to dismiss the charge. *Id.* Relying on the "undisputed facts," the district court found that: (1) the defendant had applied to adjust his status; (2) the defendant could file for permanent residency; and (3) the defendant "was not unlawfully present solely by virtue of his failure to maintain student status." *Id.* Again, the Eleventh Circuit reversed. "The district court's supervisory authority to dismiss indictments cannot be anchored to a kind of criminal summary judgment procedure," the court explained. *Id.* at 1268–69. "We recognize that our system of criminal procedure may result in legally meritless cases being sent to trial, but absent further legislative direction, it is not for the courts to filter which criminal cases may reach the trial stage by reviewing

10

the proffered evidence in advance." *Id.* at 1269. The government was thus "entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 1267–68 (cleaned up).

We, in short, cannot (as Hussaini suggests) "review [ ] the videos upon which the indictment rests," Motion at 3—even if, as in *Critzer* and *Salman*, the Government accedes to some of the Defendant's factual assertions.[3]

## II.   The Indictment satisfies FED. R. CRIM. P. 7(c)(1) and the Sixth Amendment

Next, we have little trouble concluding that the Indictment, on its face, presents "a plain, concise, and definite written statement of the essential facts constituting the offense charged," as Rule 7 requires. FED. R. CRIM. P. 7(c)(1). The Indictment, after all, cites the correct statute, properly lays out the elements of that statute,[4] and specifically describes the two videos that triggered the charges (along with the dates on which the videos were uploaded and a brief description of their contents).

---

[3] The cases are split on whether we can consider the Complaint and the agent's Affidavit. *Compare United States v. Godwin-Painter*, 2015 WL 13735432, at *5 (S.D. Ga. Aug. 18, 2015) (explaining that a criminal complaint cannot be considered when determining whether to dismiss a superseding indictment because doing so would "require[ ] the Court to erase the line between complaint and indictment" (citation omitted)), *and United States v. Clemens*, 2011 WL 1540150, at *1 n.1 (D. Mass. Apr. 22, 2011) (considering arguments on a motion to dismiss an indictment "to the extent that they are relevant to the *indictment*, which superseded the *complaint*"), *with United States v. Jones*, 383 F. Supp. 3d 810, 814 (N.D. Ill. 2019) (suggesting that "[a] court may also rely on the facts outlined in the criminal complaint and accompanying affidavit" when deciding whether to dismiss an indictment). We think the better view is that we shouldn't consider the Complaint or the Affidavit because those documents has been superseded by the Indictment. Even if we were to consider them, though, we'd still deny the Motion for many of the reasons we'll outline in Section III, *infra*—namely, that, in deciding whether a statement is a "true threat" or not, context is everything, and neither the Complaint nor the Affidavit fill in the million-and-one contextual gaps that would help us resolve this central question.

[4] As we've said, a violation of § 875(c) has two elements: "(1) the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another; and (2) the Defendant sent the message with the intent to communicate a true threat or with knowledge that it would be viewed as a true threat." Pattern Crim. Jury Instr. 11th Cir. OI O30.3 (2020). Our Indictment tracks *both* elements. *See* Indictment (alleging, as to each count, that Hussaini "did knowingly and intentionally transmit in interstate commerce . . . an electronic communication, with the purpose of issuing a threat and with the knowledge that the communication would be viewed as threat"). And, to his credit, Hussaini doesn't argue otherwise. *See generally* Motion; Reply.

The Indictment also satisfies the Sixth Amendment. As we've explained, "[t]o pass constitutional muster, an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecutions for the same offense." *Yonn*, 702 F.2d at 1348. The Indictment does this, too: It unambiguously tells Hussaini that he's been charged with violating § 875(c) for posting two threatening videos—and, in doing so, it allows him to raise a double-jeopardy challenge to any future attempt to punish him for the publication of those two videos. There is, in sum, nothing *technically* wrong with the Indictment—at least on its face.

### III.    A reasonable jury could find that Hussaini made "true threats"

None of what we've said thus far fully resolves Hussaini's principal contention, though, which is that his statements, while disturbing, cannot constitute "true threats" because their target audience (all blacks and Christians) was too nebulous—too indeterminate. *See* Motion at 6 ("The statements here do not constitute 'true threats' because they were not directed at any '*particular* individual or group of individuals[.]'" (quoting *Black*, 538 U.S. at 359)). And that's because, as Hussaini points out, we can think of many hypothetical indictments that, on their face (and without reference to *any* extraneous information), *would* violate the First Amendment. Imagine, for instance, an indictment that charged a defendant with violating § 875(c) for supporting, in an op-ed, a particular politician's plan for welfare cuts. Would we need to wait for a trial before dismissing *that* indictment as facially deficient? Of course not—because there's simply no set of circumstances in which the government could proscribe the publication of *that* statement.

Imagine, on the other hand, an indictment that charged a defendant with violating § 875(c) by calling his neighbor on the phone and threatening to come down there, at 2:00 PM tomorrow, to "shoot you with my loaded revolver." Even Hussaini would concede that we'd have no discretion to dismiss *that* indictment.

What we're getting at, of course, is that there's some line out there that separates the very rare

indictment—so plainly deficient, on its face, that a judge *must* dismiss it—from the vast majority of *other* indictments, some of which will (ultimately) prove to be ill-founded, but all of which must be allowed to proceed to trial. And we needn't delineate today the precise contours of that line because, wherever that line is drawn and however far it extends, our Indictment plainly falls into the latter class—and here are a couple of reasons why:

To begin with, as *Watts* and its progeny make clear, the question of whether a statement constitutes a "true threat" is answered by reference to how a reasonable (read: objective) listener would interpret that statement—given *all* the surrounding circumstances.[5] *See, e.g., United States v. Martinez (Martinez I)*, 736 F.3d 981, 985 (11th Cir. 2013), *vacated on other grounds by Martinez v. United States*, 576 U.S. 1001, 1001 (2015) ("Following *Watts*, most federal courts of appeals defined true threats according to an *objective* standard." (emphasis added)); *see also Doe v. Pulaski Cnty., Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (en banc) (defining a "true threat" as a "statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another"). And we typically leave questions of reasonableness for the jury—not unelected judges—to decide. *See Trucks, Inc. v. United States*, 234 F.3d 1340, 1343 (11th Cir. 2000) ("[Q]uestions of reasonableness and state of mind are proper questions for the jury and should not be decided on summary judgment."); *Brooks v. United States*, 837 F.2d 958, 965 (11th Cir. 1988) ("The reasonableness of [a defendant's] actions was for the jury[.]"); *Bryan v. Jones*, 530 F.2d 1210, 1218 (5th Cir. 1976) (Wisdom, J., concurring in part and dissenting in part) ("[R]easonableness is basically a jury question; it is a concept that loses meaning when courts try to pin it down."); *James Talcott, Inc. v. Jack Cole Co.*, 441 F.2d 325, 329 (5th Cir. 1971) ("We hold, however, that, nonetheless, the question of

---

[5] *Watts*, remember, found that the defendant's comments about President Johnson weren't "true threats" (in part) because of (1) the setting (a political rally) and (2) the audience's reaction (laughter). *See Watts*, 394 U.S. at 708.

reasonableness was for the jury."); *Hagerty v. L&L Marine Servs., Inc.*, 788 F.2d 315, 318 (5th Cir. 1986) ("It is for the jury to decide questions such as the existence, severity and reasonableness of the fear."); *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury.").

It's thus unsurprising that the question of whether a statement constitutes a "true threat" has almost always been reserved for the jury. *See, e.g.*, *Kosma*, 951 F.2d at 555 ("Whether a speaker's language constitutes a threat is a matter to be decided by the trier of fact."); *Parr*, 545 F.3d at 497 ("We think it readily apparent that Parr's statements were threats, but ultimately that question was for the jury."); *Viefhaus*, 168 F.3d at 397 ("Whether a defendant's statement is a true threat or mere political speech is a question for the jury.").

And this makes sense given what we know about how people come to perceive statements as threatening. So, for instance, whether we view a statement as threatening may turn on what we know about the *speaker*. Suppose that someone looks you in the eye and says: "I'm going to take care of you." In assessing the threat level we should ascribe to this statement, it helps to know whether the speaker is Florence Nightingale or Tony Soprano. Beyond the identity of the speaker, though, there are countless, unseen things that inform how our brains come to perceive a situation as threatening. *Cf.* Daniel Kahneman, Thinking Fast and Slow 71 (First paperback ed. 2013) ("[W]e have in our head a remarkably powerful computer, not fast by conventional hardware standards, but able to represent the structure of our world by various types of associative links in a vast network of various types of ideas."). In other words, an otherwise-innocuous statement might be reasonably perceived as threatening only because of the "tone of the [speaker's] voice when he convey[s] the threats," *United States v. Castillo*, 564 F. App'x 500, 503 (11th Cir. 2014), or because of the speaker's affect, *see New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 476 (S.D.N.Y. 2006) (holding that a defendant's statements

amounted to "true threats," in part, because he made the statements while "extremely close to [the victim], screaming, and pointing a finger in [her] face"), or because of something the speaker is holding (think of Hussaini wielding a knife as he discusses stabbing Christians) or doing (remember Hussaini lighting a fire as he describes burning black people).

Hussaini, of course, concedes all of this. "My statements *were* threatening," he seems to admit, "but they're still protected by the First Amendment because they weren't directed at a discrete enough group of people." We disagree. For one thing, blacks and Christians *are* "discrete and identifiable"[6] groups. *See* OXFORD ENGLISH DICTIONARY (3d ed. 2007) (defining "discrete" as "individually distinct"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1870 (unabridged 1961) (defining "race" as the "descendants of a common ancestor: a family, tribe, people, or nation belonging to the same stock"); BLACK'S LAW DICTIONARY 1423 (4th ed. 1951) ("Race. An ethnical stock; a great division of mankind having in common certain distinguishing peculiarities constituting a comprehensive class appearing to be derived from a distinct primitive source. A tribal or national stock, a division or subdivision of one of the great racial stocks of mankind distinguished by minor peculiarities. Descent."); *see also Shaw v. Reno*, 509 U.S. 630, 643–44 (1993) (discussing courts' strict scrutiny of "racial classification[s]" because those classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to incite hostility"). It's, therefore, no surprise that the only federal circuit court of appeals to address this question—*viz.*, whether § 875(c) requires that the threat be directed at a specific individual or group—has squarely rejected Hussaini's position. *See United States v. Cox*, 957 F.2d 264, 266 (6th Cir. 1992) ("Cox would avoid responsibility under [§ 875(c)] by claiming that the alleged threat did not identify any specific person or group. We do not read the statute to be so limited, and Cox cites no cases that have placed this restrictive

---

[6] This is a phrase Hussaini uses several times. *See, e.g.*, Motion at 7.

interpretation on the statute.").

And the Supreme Court's decision in *Black* seems to support the Government's view that Hussaini's threats were particularized *enough*. In *Black*, recall, the Supreme Court rejected the First Amendment contentions of a man who led a cross-burning rally, not in the yard of a particular individual or on the property of a specific group, but in a field owned by another man *who had consented to the ritual. See Black*, 538 U.S. at 348. In doing so, the Court explained that, while burning two pieces of wood may not, in and of itself, be threatening, cross burning has taken on a threatening message because of what it's come to represent—hatred of (and violence against) blacks, Jews, homosexuals, Catholics, etc. *See id.* at 352–57 (detailing the history of cross burning, beginning with its origins in the 14th century, and describing how the Ku Klux Klan "used cross burnings as a tool of intimidation and a threat of impending violence"). There was thus no argument in *Black* that the defendant had targeted any *specific* individual or group—other than the very broad swaths of the population that have traditionally been targeted by cross burners (blacks, Jews, etc.). If the First Amendment tolerated the (very) open-ended threats at issue in *Black*, then Hussaini's more specific threats against blacks and Christians would seem equally unworthy of protection.[7]

And we think context has a role to play here, too. Remember how important it was in *Watts* that the audience laughed. *See Watts*, 394 U.S. at 708 ("Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise."). Drawing from *Watts*, we would do well to ask ourselves some (or all) of the following questions: What if Hussaini's neighbor at the time he recorded the videos was a black Christian? And what if the videos were made *only* one day (or one hour or one minute) after Hussaini

---

[7] And it's not enough to distinguish *Black* on the ground that the cross in that case could only intimidate the people who happened to drive by the open field where the cross was burning. And that's because, it goes without saying, the videos in our case could only intimidate the people who happened to come across Hussaini's YouTube postings—a rather specific crowd, we should think.

had been involved in a nasty dispute with this black Christian neighbor? And what if our black Christian neighbor then happened to watch Hussaini's video—the day after their dispute had ended in acrimony? Do we think the neighbor might have laughed? More to the point, would it have been reasonable for that neighbor—having watched the video and understood the context in which it was created—to feel afraid, to feel *threatened*? Could we fault the neighbor, in short, for having refused to laugh—for having taken Hussaini' threats rather seriously, rather *personally*? These are questions we cannot answer in a vacuum—cannot answer them because, aside from a brief description of the videos' *contents*, the Indictment doesn't tell us anything about the *context* in which they were made. And we think these are precisely the kinds of questions a jury—not a judge—should have the chance to review (and, perhaps, answer) here.

Against all this, Hussaini's managed to dredge up only a single case—issued 26 years ago—by a district judge in Michigan. *See Baker*, 890 F. Supp. at 1375. In *Baker*, a college student was charged with violating § 875(c) for describing, in private emails to a friend, his violent fantasies—fantasies that included harming "a 13 or 14-year-old," injuring a "girl," and torturing a "petite and cute south American girl in one of my classes[.]" *Id.* at 1387–89 (cleaned up). Before trial, the defendant moved to dismiss the indictment, arguing (as Hussaini does here) that his private emails couldn't be construed as "true threats" because no specific person (or group of persons) was in fact threatened. *See id.* at 1380 ("Baker . . . has filed a motion seeking dismissal of all the counts of the superseding indictment. He contends that application of 18 U.S.C. § 875(c) to the e-mail transmission pushes the boundaries of the statute beyond the limits of the First Amendment."). The district judge agreed, noting that the emails did "not refer to a sufficiently specific class of targets." *Id.* at 1388. *Baker* thus "presented the rare case in which the language set forth in the indictment is so facially insufficient that it cannot

possibly amount to a true threat." *Id.* at 1390 (cleaned up).[8]

For two reasons, *Baker* cannot guide us here. *First*, it's the decision of a district court judge that no other federal court—at the trial or appellate levels—has ever followed. *Second*, the statements at issue in *Baker* were categorically different from ours in (at least) one critical respect. In *Baker*, remember, the defendant had exchanged *private* emails with a friend. *See Baker*, 890 F. Supp. at 1386. And it seemed clear to the judge that the recipient of Baker's messages—the friend—had "apparently enjoyed" the exchange. *Id.* Since the question in *Baker* (as here) was "how a reasonable person would expect" the recipient "to interpret the e-mail messages," the court easily concluded that "[i]t would be patently unreasonable after reading his messages to think that Baker's communications caused their only foreseeable recipient . . . to fear violence or caused him any disruption due to fear of violence." *Id.* Here, by contrast, Hussaini posted his videos online for all to see. As we've explained, we have no idea who saw the videos, how those people perceived those videos, or whether their perceptions were reasonable in light of the circumstances in which they perceived them. *Baker*, then, is neither here nor there.

For all these reasons, we **DENY** Hussaini's Motion to Dismiss the Indictment [ECF No. 77].

---

[8] The Sixth Circuit affirmed *Baker*, but on entirely different grounds. *See United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997), *abrogation recognized by United States v. Doggart*, 906 F.3d 506 (6th Cir. 2018). Acknowledging that "neither the district court's opinion nor the parties' briefs contain any discussion regarding whether Baker's e-mail messages initially satisfy the requirements of § 875(c)," the Sixth Circuit affirmed because (it felt) the indictment failed to state a viable offense under § 875(c). *Id.* at 1493. It did so only after defining "a communication containing a threat" to mean (1) "a communication . . . that a reasonable person . . . would take . . . as a serious expression of an intention to inflict bodily harm (the means rea)" if (2) a reasonable person "would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus)." *Id.* at 1495. The court, however, "declined to address the First Amendment issues raised by the parties," *id.* at 1493 (cleaned up)—including, as relevant here, the district court's finding that the defendant hadn't targeted a specific enough group of people. In any event, twenty-one years later, the Sixth Circuit recognized that *Alkhabaz*'s definition of the word "threat," as it appears in § 875(c), was (in light of *Elonis*) "no longer the law of the circuit." *Doggart*, 906 F.3d at 512. *Alkhabaz*, in short, is inapposite here.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 13th day of January 2022.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record